# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| KEVIN GERRARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.  08-cv-1146 |
| GARDA SECURITY, INC., JERRY | ) | |
| SARGENT, individually, and | ) | |
| CHRISTINA MANSFIELD, individually, | ) | |
| ANDREWS INTERNATIONAL INC., as | ) | |
| Successor in Interest to GARDA | ) | |
| SECURITY, INC., as Successor in | ) | |
| Interest to Vance Uniformed Protection | ) | |
| Services, | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 71). Plaintiff timely filed a Response (Doc. 82) to which Defendants filed a Reply (Doc. 88). For the following reasons, Defendants' Motion for Summary Judgment (Doc. 71) is GRANTED.

## INTRODUCTION

Plaintiff was hired by Vance Uniformed Protection Services on August 6, 2004. (Doc. 71 ¶ 1). Vance was acquired by Defendant Garda Security, Inc., ("Garda") in 2005, which was in turn acquired by Defendant Andrews International, Inc., ("Andrews") in June 2009. (Doc. 71 ¶¶ 2, 150). Over the course of his employment, Plaintiff was the Managing Director of a division concerned with providing security-guard services to the facilities of its clients. (Doc. 71 ¶¶ 3-5).

Defendant Sargent was hired as Vance's EEO Director in December 2005, and he became Garda's Human Resources Director in 2007. (Doc. 71 ¶ 9). Defendant Mansfield began working for Vance in 2003, and eventually obtained the position of Garda's Vice President of Human Resources. (Doc. 71 ¶ 8).

On April 25, 2008, Plaintiff filed a three-count complaint in the Circuit Court of the Eleventh Judicial Circuit, McClean County, Illinois, alleging defamation against Defendants Garda, Sargent, and Mansfield. (Doc. 1-1 at 4). The Defendants removed the case to this Court on June 23, 2008, on the basis of diversity jurisdiction under 28 U.S.C. §§ 1332, 1441, & 1445. (Doc. 1). On September 14, 2009, Plaintiff filed a Third Amended Complaint,[1] in which he added claims for violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et. seq.* and the American with Disabilities Act of 1990[2] against Defendant Andrews, as Successor in Interest to Defendant Garda. (Doc. 42 at 6-13).

On February 15, 2011, Defendants filed their Motion for Summary Judgment, in which they seek judgment as a matter of law upon all of Plaintiff's claims. (Doc. 71). After requesting various extensions of time to respond, Plaintiff filed his Response to Defendants' Motion for Summary Judgment (Doc. 82) on April

---

[1] Plaintiff filed his First Amended Complaint on March 25, 2009, in which he corrected the name of Defendant Garda (Doc. 23), and his Second Amended Complaint on April 14, 2009 (Doc. 27), in which he struck various portions of his original complaint which had been ordered dismissed by this Court in its Order and Opinion of February 17, 2009 (Doc. 17).

[2] Plaintiff has failed to respond to Defendants' Motion for Summary Judgment with respect to his ADA claim in any way. (See Doc. 82). The Court views Plaintiff's failure to respond as a waiver of his claim, and therefore judgment as to the ADA claim will be entered in favor of Defendant Andrews without further discussion by the Court. *See Wojtas v. Capital Garden Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (plaintiffs' failure to offer any opposition to defendant's statute of limitations argument constituted a waiver.).

25, 2011. On May 27, 2011, Defendants filed their Reply (Doc. 88). Accordingly, this matter is now ripe for review by this Court. Because Plaintiff's defamation claims and his FMLA claim are distinct in terms of both their facts and law, the Court will first discuss Plaintiff's defamation claims before turning to his FMLA claim.

## DEFAMATION

### I. Factual Background[3]

As previously stated, Defendant Sargent was hired as Vance's EEO Director in December 2005, and he became Garda's Human Resources Director in 2007. (Doc. 71 ¶ 9). In these positions, one of Sargent's responsibilities was to investigate complaints made by employees against other employees. (Doc. 71 ¶ 10). In early 2006, Sargent became aware of a complaint lodged by a client in Huntsville Alabama, which was a site for which Plaintiff was responsible. (Doc. 71 ¶ 12). On March 14, 2006, Sargent travelled to Huntsville to conduct an on-site investigation. (Doc. 71 ¶ 13). As part of this investigation, Sargent spoke with several guards working at the site, with Glenn Bracken, the Project Manager at the site and Plaintiff's direct subordinate, and with Heather Hathaway, the client's safety manager and Garda's main point of contact for the site. (Doc. 71 ¶ 14). Sargent did not interview Plaintiff as part of his investigation. (Doc. 82 AMF ¶ 1).[4]

Through his investigation, Sargent learned of numerous complaints which the guards and Hathaway had, most of which pertained to Bracken's management

---

[3] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.
[4] "AMF" refers to Plaintiff's "Additional Material Facts."

rather than Plaintiff's. (Doc. 71 ¶ 15). However, Hathaway did tell Sargent that Plaintiff was rude to her, only spoke to her briefly, and made her feel that she was not worth his time and energy, which she believed was caused by his dislike for dealing with females. (Doc. 71 ¶¶ 16-17). At the conclusion of his investigation, Sargent wrote a report ("Huntsville Report") detailing the allegations, his investigatory steps, and what he learned via the various interviews he conducted, but did not reach any conclusions regarding whether Plaintiff did what he was accused of or whether he should be disciplined. (Doc. 71 ¶¶ 21-22). Nonetheless, Plaintiff alleges that during his investigation Sargent told Bracken, Hathaway, and two other individuals[5] that Plaintiff had "screwed up" an earlier investigation at the Huntsville site, that he "didn't like [Plaintiff's] management style" and that the account should be reassigned to someone other than Plaintiff. (Doc. 71 ¶¶ 19-20). Plaintiff claims to have learned this information from Bracken. (Doc. 71 ¶¶ 19-20).

Several months after the Huntsville investigation terminated, on July 11, 2006, Cathy Salves – a direct subordinate of Plaintiff's – submitted a "Formal Complaint Against [Plaintiff]" to Sargent. (Doc. 27 ¶¶ 23-24). In her formal complaint, Salves made various allegations against Plaintiff, the main thrust of which was that she had "reached a point where [she could] no longer take [Plaintiff's] abusive, aggressive, harassing, bullying, in-your-face micromanaging style." (Doc. 71 ¶¶ 24-25). After sending her complaint, however, Salves spoke with Sargent and asked him not to investigate or take any further action. (Doc. 71 ¶ 26).

---

[5] These two individuals were Tom Carter, Garda's Managing Director of National Operations at the time, and Morris Lane, the Managing Director of a different region. (Doc. 71 ¶ 20).

Two months later, in September 2006, Sargent received another written complaint against Plaintiff, this one from Roger Traughber, a "roving director" for Garda. (Doc. 71 ¶¶ 28-30). In addition to his written complaint, Traughber also called Sargent several times to complain that Plaintiff had spoken to him in an intimidating and harassing manner, that Plaintiff had made "belittling and demeaning" statements to him, and that he felt that Plaintiff was "out to get him for some reason." (Doc. 71 ¶ 30). Plaintiff prepared a written response to Traughber's complaint, in which he denied the allegations and dismissed Traughber's complaint as a "'hatchet job' from a disgruntled subordinate who does not want to be held accountable." (Doc. 71-11 at 3). At this time, Plaintiff states that Sargent told a Project Manager named Robbie Tyson that Plaintiff was harassing and intimidating the employees and that Traughber and others had complained about him. (Doc. 71 ¶ 32).[6]

Also in September of 2006, Sargent received complaints from Brenda and Larry Wells regarding their interactions with Plaintiff. (Doc. 71 ¶¶ 31-35). The Wells were a husband and wife who worked for Garda at an International Truck & Engine ("ITE") site in Conway, Arkansas. (Doc. 71 ¶ 31). Larry was a Project Manager at the site and subordinate of Plaintiff's and Brenda was Captain of the Guard. (Doc. 71 ¶ 31). The Wells alleged, among other things, that Plaintiff was rude and intimidating to Larry and that he had been generally dismissive of Brenda and her opinions because she was female. (Doc. 71 ¶ 35). Plaintiff submitted a written response to these complaints in which he denied any allegations of

---

[6] Plaintiff claims to have learned this information from Tyson. (Doc. 71 ¶ 32).

wrongdoing. (Doc. 71-13). Plaintiff wrote that he believed this situation was "ludicrous," that he believed Traughber had encouraged the Wells' complaints, and that if it was not rectified promptly, he would file a defamation action against both Traughber and the Wells. (Doc. 71-13).

Sargent did not go on site to investigate the Wells' complaints. (Doc. 82 AMF ¶ 3). However, he did speak with John Maddox, an ITE employee and Garda's point of contact at the site. (Doc. 71 ¶ 37). Maddox told Sargent that in the several meetings he had held with Plaintiff, he found him to be "arrogant" and "dismissive," and that Plaintiff had bad-mouthed his own employees—specifically Brenda and Larry Wells—to Maddox. (Doc. 71 ¶¶ 38-39). At some point, Sargent also spoke with Tom Parrish, Plaintiff's direct supervisor. (Doc. 83-2 at 59-60). Parrish told Sargent that he was with Plaintiff at the Arkansas site at the time that the events giving rise to the Wells' initial complaint took place, and that he never saw any of the alleged actions take place. (Doc. 83-2 at 64).

On October 16, 2006, Sargent wrote a memo to Parrish and Obie Moore, Garda's then-Senior Vice President, summarizing the complaints made by Traughber, the Wells, and Maddox. (Doc. 71-9). Sargent was careful to note that many of the complaints against Plaintiff were matters of "perception" or "perceived behavior," and that there were no other witnesses to the events. (Doc. 71-9). He concluded his report by stating: "One can only draw the conclusion that the client is validating the employee's complaints concerning behavioral issues and interpersonal skill with [Plaintiff] . . . these complaints were not the first complaints of a similar nature that have been filed against [Plaintiff], but to my

knowledge only the first ones that were not withdrawn before the investigation was completed. It should be noted that [Plaintiff's] managerial skills were not in dispute here, but only his interpersonal skills and his perceived harassing and intimidating behavior toward subordinates and relationships with clients." (Doc. 71-9 at 7).

Sargent also believed that a formal written warning was appropriate as a result of this investigation. (Doc. 71 ¶ 43). Accordingly, on October 24, 2006, Sargent prepared a first draft of a written warning to Plaintiff for Parrish's signature. (Doc. 71 ¶ 44). This initial draft opened with the language: "This memo shall serve as a final written notice of unsatisfactory performance referencing improper activities and language, including, but not limited to, harassment, sexual harassment, and hostile work environment." (Doc. 71-14). However, after discussing the warning with Parrish, Sargent "softened" the warning in a second draft. (Doc. 71 ¶ 46; 83-2 at 73-74).[7] Accordingly, the opening paragraph of the second draft read: "As you know, we have completed our investigation into three allegations of Harassment against you. While this investigation did not demonstrate a pattern of harassment by you against the three complainants, it does demonstrate a need for you to evaluate your approach to your subordinates." (Doc. 71-15).[8]

_____

[7] Parrish told Sargent that he did not think the warning should intimate that Plaintiff was guilty of any kind of harassment, sexual harassment or intimidation. (Doc. 83-2 at 74).

[8] Despite the revision of the warning, an unsigned copy of the first draft is in Plaintiff's file as Plaintiff never signed the version of the warning he was given and thus Sargent never received a signed copy back to replace the unsigned first version. (Doc. 71 ¶¶ 49-50).

Finally, Sargent prepared a memorandum to Larry and Brenda Wells informing them of the results of his investigation. (Doc. 71 ¶ 51). Sargent concluded the memo by stating: "My investigation revealed that there was no available corroborating evidence to prove or disprove any allegations made by Larry and Brenda Wells, or in the rebuttal statements provided by [Plaintiff]. Statements relied upon in this complaint were either taken out of context, or not corroborated, so as to make one believe that it was more likely than not that the statements were not made or were unproven. [Plaintiff] was advised to be more cognizant of making potential statements that could be construed or perceived by another in any manner other than that intended." (Doc. 71 ¶ 53). However, Plaintiff has conceded that Sargent did not intend this language to mean that the allegations were not true, only that they were unproven on either side. (Doc. 71 ¶¶ 54-55).

Almost a year later, in September 2007, Cathy Salves once again contacted Sargent to complain about Plaintiff. (Doc. 71 ¶ 56). Salves called Sargent almost daily, making allegations that Plaintiff was creating a hostile work environment, frequently yelling at her, and thus causing her to seek medical help. (Doc. 71 ¶ 57). On September 11, 2007, Salves provided Sargent with a short memo detailing a couple of incidents with Plaintiff, and on September 14, 2007, Ron Beese, one of Salves' coworkers, provided a written statement in support of Salves' complaints. (Doc. 71 ¶¶ 59-60). On September 24, 2007, Salves resigned. (Doc. 71 ¶ 61). That same day, she sent Sargent another written complaint explaining that her decision to resign was driven by Plaintiff's "hostile, abusive, intimidating, aggressive and unprofessional behavior" which had become "intolerable." (Doc. 71 ¶ 62). She also

listed a number of specific allegations in her complaint, and concluded by stating "[Plaintiff] has belittled me, be raided [sic] me, embarrassed me, screamed, yelled. . . . I feel that I am being singled out and treated in a matter that has led me to resign. . . . I made the decision to leave because I have allowed [Plaintiff] to beat me down to the point of little confidence in my abilities." (Doc. 71-20 at 5).

After receiving Salves' complaints and resignation, Sargent states that he believed the various accusations made against Plaintiff over the past year and a half were likely true. (Doc. 71-3 ¶ 8). Because of his concerns regarding Plaintiff's interactions with his subordinates and clients, Sargent discussed the matter with Mansfield, who was his supervisor. (Doc. 71 ¶ 68). Although she did not do any independent investigation into the complaints (Doc. 82 AMF ¶¶ 8-9), Mansfield shared Sargent's concerns and the two of them decided they should bring the issue to the attention of Garda's President, LeMarque Sheppard. (Doc. 71 ¶ 69). Accordingly, Mansfield alerted Sheppard to the pattern of complaints against Plaintiff, and Sheppard decided that he wanted to have a face-to-face meeting. (Doc. 71 ¶ 71).

On October 2, 2007, Sheppard, Sargent, Mansfield, and Plaintiff met at corporate headquarters. (Doc. 71 ¶ 72). According to Plaintiff, at this meeting Sargent and Mansfield told Sheppard 1) that the allegations made against Plaintiff by Hathaway, Traughber, the Wells, and Salves were true, 2) that Sargent had received complaints against Plaintiff from all of his subordinate's save one, and 3) that Plaintiff had established a pattern of being abusive to his employees. (Doc. 71 ¶¶ 73-76). Sheppard then cursed at Plaintiff and berated him, and directed him to

write a letter of apology to Salves or else be terminated. (Doc. 71 ¶¶ 77-78). Plaintiff filed his original complaint for defamation against Garda, Sargent, and Mansfield on April 25, 2008.

## II. Legal Standard

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. *Id.*

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). Further, mere conclusory allegations are not enough, the non-movant must "come forward with evidence that would reasonably permit the finder of fact to find in its favor on a material question." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact

exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," such matters must be left for the jury. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

## III. DISCUSSION

In Counts I, II, and III of his Third Amended Complaint, Plaintiff alleges that Defendants Sargent and Mansfield defamed him, and that Defendant Garda is responsible under a theory of respondeat superior. (Doc. 42 at 1-6). In order to succeed on a defamation claim, a plaintiff must demonstrate that the defendant made a false statement about the plaintiff, that the statement was published to a third party, and that the publication of the false statement caused damage to the plaintiff. *See, e.g., Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 571 (1988). If a statement is defamatory *per se*, then a plaintiff does not need to prove special damages. *See, e.g., Gardner v. Senior Living Sys., Inc.*, 731 N.E.2d 350, 354 (2000). Among the categories of statements that are considered defamatory *per se* are words that impute that a person is unable to perform or lacks integrity in performing his employment duties and words that impute that a person lacks ability in his profession. *See, e.g., Quality Granite Constr. Co v. Hurst-Rosche Eng'rs, Inc.*, 632 N.E.2d 1139 (1994). Garda is liable for the defamatory statements of its employees under the doctrine of *respondeat superior*. *See Reed v. Nw. Publ'g Co.*, 530 N.E.2d 474, 484 (1988).

While Defendants list all of the statements they believe Plaintiff to be alleging as defamatory in their Motion for Summary Judgment, Plaintiff does not specifically respond thereto, and thus the Court will rely upon the undisputed facts, as well as Plaintiff's alleged Additional Material Facts, to determine what statements Plaintiff is alleging to have defamed him. Under such analysis, and drawing all inferences in favor of Plaintiff, the Court finds that Plaintiff points to the following: 1) Sargent's statements to Bracken, Hathaway, Carter, and Lane in March 2006 that Plaintiff had "screwed up" an earlier investigation, that he didn't like Plaintiff's management style, and that the Huntsville account should be assigned to someone else (Doc. 71 ¶¶ 19-20); 2) Sargent's statements to Robbie Tyson in September 2006 that Plaintiff was "harassing and intimidating the employees" and that there had been complaints about Plaintiff (Doc. 71 ¶ 32); 3) statements made by Sargent to Tom Parrish during the investigation of the Wells' complaints that Plaintiff had sexually harassed employees (Doc. 82 ¶ 21; 83-2 at 56); 4) the memo written by Sargent on October 16, 2006, summarizing the complaints made against Plaintiff by Traughber and the Wells, and reaching various conclusions concerning Plaintiff's behavior (Doc. 71 ¶¶ 41-42); 5) the first draft of the warning letter Sargent prepared on October 24, 2006 which was placed in Plaintiff's file (Doc. 71 ¶ 44); 6) the second draft of the warning letter Sargent prepared on October 25, 2006 (Doc. 71 ¶ 47); 7) Sargent's statements to Eric Saleh in the "spring of 2007" that Plaintiff was overbearing, abused employees, and had sexually harassed an employee (Doc. 71 ¶ 81);[9] 8) Sargent's statements to Drew

---

[9] As will be discussed *infra*, the only evidence of this statement is Plaintiff's

Brady sometime in 2007 that Plaintiff was overbearing, had a demeaning attitude towards employees, and that Sargent didn't like Plaintiff's management style (Doc. 71 ¶ 82)[10]; 9) Sargent's statements to Mansfield in September 2007 concerning the complaints against Plaintiff (Doc. 71 ¶ 68); 10) Mansfield's discussion of the complaints against Plaintiff with Sheppard (Doc. 71 ¶ 71); and 11) Sargent and Mansfield's statements to Sheppard at the October 2, 2007 meeting that the allegations made against Plaintiff by Hathaway, Traughber, the Wells, and Salves were true, that Sargent had received complaints about Plaintiff from all but one of his subordinates, and that Plaintiff had established a pattern of being abusive to his employees (Doc. 71 ¶¶ 73-76).

Defendants do not argue that at least some of the statements made by Sargent and Mansfield were not defamatory, however they claim that none of the alleged statements are actionable as a matter of law, for at least one of five reasons. These reasons include: (1) the statements are entitled to qualified privilege; (2) the statements are barred by the statute of limitations; (3) the only evidence of the statements is predicated on inadmissible hearsay; (4) the statements are protected by the First Amendment; and (5) the statements are not defamatory because they were true. (Doc. 71 at 32). Defendants argue that all of the alleged defamatory statements are protected by the qualified privilege, in addition to at least one of the other four defenses. (Doc. 71 at 32-38). While Plaintiff responds to Defendants' argument concerning qualified privilege, his only response to the remainder of

---

testimony that Saleh told him what Sargent had said. (Doc. 71 ¶ 81).

[10] As will be discussed *infra*, the only evidence of this statement is Plaintiff's testimony that Brady told him what Sargent had said. (Doc. 71 ¶ 82).

Defendants' argument is: "the relevant statements are not time-barred, not protected by the First Amendment and are false." (Doc. 82 at 17). Accordingly, Plaintiff not only fails to address any of these additional arguments in a meaningful way, he also completely ignores Defendants' argument concerning hearsay. While the Court is inclined to find that Plaintiff's failure to respond with more than an undeveloped and conclusory statement waives any objection to Defendants' arguments as to the final four defenses, *see Wojtas v. Capital Garden Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007), because Plaintiff at least acknowledges that such arguments were made, the Court, in an abundance of caution, will examine their merits. After resolving which statements are non-actionable as a result, the Court will analyze the application of qualified privilege to those that remain.

### A. Statute of Limitations

In Illinois, the statue of limitations to file a defamation claim is one year. 735 Ill. Comp. Stat. 5/13-201; *see Hukic v. Aurora Loan Svcs.*, 588 F.3d 420, 435 (7th Cir. 2009), *Peal v. Lee*, 933 N.E.2d 450, 461 (Ill. 2010). The statute of limitations "generally beings to run on the date of publication of the allegedly defamatory material." *Hukic*, 588 F.3d at 435. However, "under certain circumstances, such as when the publication was 'hidden, inherently undiscoverable, or inherently unknowable,' Illinois courts apply the 'discovery rule' such that the statute of limitations does not accrue until the plaintiff knew or should have known of the discriminatory report." *Id.*

Plaintiff filed his initial suit in Illinois state court alleging defamation against Defendants Sargent, Mansfield, and Garda on April 25, 2008. (Doc. 1-1).

Accordingly, any alleged defamatory statements published more than one year before that date, or before April 25, 2007, are time-barred unless the "discovery rule" applies. However, as previously noted, Plaintiff has not made any argument in this regard, and thus the Court will presume that no special circumstances are at play with respect to the commencement of the statute of limitations in this case.

Therefore, all of the alleged defamatory statements made by Sargent prior to April 25, 2007 are time-barred and not actionable as a matter of law. These include: 1) Sargent's statements to Bracken, Hathaway, Carter, and Lane in March 2006 that Plaintiff had "screwed up" and earlier investigation, that he didn't like Plaintiff's management style, and that the Huntsville account should be assigned to someone else (Doc. 71 ¶¶ 19-20); 2) Sargent's statements to Robbie Tyson in September 2006 that Plaintiff was "harassing and intimidating the employees" and that there had been complaints about Plaintiff (Doc. 71 ¶ 32); 3) statements made by Sargent to Tom Parrish during the investigation of the Wells' complaints that Plaintiff had sexually harassed employees (Doc. 82 ¶ 21; 83-2 at 56); 4) the memo written by Sargent on October 16, 2006, summarizing the complaints made against Plaintiff by Traughber and the Wells, and reaching various conclusions concerning Plaintiff's behavior (Doc. 71 ¶¶ 41-42); 5) the first draft of the warning letter Sargent prepared on October 24, 2006 which was placed in Plaintiff's file (Doc. 71 ¶ 44); and 6) the second draft of the warning letter Sargent prepared on October 25, 2006 (Doc. 71 ¶ 47). Because these statements are time-barred and therefore not actionable, judgment as to them must be entered in favor of Defendants.

**B. Hearsay Evidence**

In order to withstand a motion for summary judgment, the evidence upon which Plaintiff relies to support his claims must be admissible at trial. *See* Fed. R. Civ. Pro. 56(c)(2); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) ("In order to defeat a motion for summary judgment, a plaintiff must present admissible evidence that raises a genuine issue of material fact."). Defendants argue that, at least with respect to some of the alleged defamatory statements, Plaintiff's only support that they were made is hearsay evidence which would not be admissible at trial. (Doc. 71 at 34).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay evidence is generally not admissible. Fed R. Evid. 802. "Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged defamatory statement but was later told by another that the statement was made, such testimony is rejected as hearsay. *Schindler*, 474 F.3d at 1011 (holding that a plaintiff could not introduce through his own testimony what he was told by another person regarding a defamatory statement about him).

Here, the only evidence that Plaintiff proffers for several of the statements he alleges Sargent made against him is the fact that someone else told him these statements were made. Of the statements which have not already been determined to be time-barred, these statements include those Sargent allegedly made to Eric

Saleh and Drew Brady.[11]   In their Undisputed Material Facts, Defendants state that "According to [Plaintiff], Eric Saleh . . . told him that Sargent called him . . . ;" and "According to [Plaintiff], Drew Brady . . . told him that . . . Sargent told Brady . . . ." (Doc. 71 ¶¶ 81-82).  Plaintiff does not dispute the manner in which Defendants present these facts (Doc. 82 at 3), point to any additional evidence of Sargent's statements to Saleh and Brady, or make any argument as to why Saleh and Brady's statements to Plaintiff about what Sargent said to them is not hearsay.  (See Doc. 82).  Accordingly, because the only evidence of Sargent's statements to Saleh and Brady is hearsay, there is no genuine issue of material fact for trial and judgment as to them must be entered on behalf of Defendants.

## C. First Amendment Protections

While the nature of a statement may classify it as defamatory *per se*, "to be actionable, [a plaintiff] must show that the statement is not protected speech under the first amendment [sic] to the United States Constitution." *Hopewell v. Vitullo*, 701 N.E.2d 99, 102 (Ill. App. Ct. 1998).  A statement is protected by the First Amendment if "it cannot be reasonably interpreted as stating actual facts about the plaintiff." *Id.* at 103.  To determine whether a statement reasonable presents or implies the existence of facts about a plaintiff, a court considers: 1) "whether the language of the statement has a precise and readily understood meaning," 2) "whether the general tenor of the context in which the statement appears negates the impression that the statement has factual content," and 3) "whether the statement is susceptible of being objectively verified as true or false." *Id.*  The

---

[11] The same analysis would apply to the statements Sargent allegedly made to Bracken, Hathaway, Carter, and Lane, as well as those he allegedly made to Tyson.

courts greatest focus should be on whether the statement contains an objective verifiable assertion. *Chicago Conservation Ctr. v. Frey*, 40 Fed. Appx. 251, 256 (7th Cir. 2002).

While all of the statements Defendants argue to be protected by the First Amendment have already been disposed of on other grounds, the Court notes that the First Amendment would protect several of them as well. These include Sargent's statements in the second draft of the warning letter that Plaintiff "needs to evaluate his approach to subordinates," and his alleged statements to Brady that he "didn't like [Plaintiff's] management style." Neither of these statements contains an objective verifiable assertion, and therefore both would be protected under the First Amendment.

### D. Substantial Truth

A statement alleged to be defamatory is not actionable if it is true. *Harrison v. Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 766 (Ill. Ct. App. 2003). "The defendant need only demonstrate the 'substantial truth' of the allegedly defamatory material to establish the defense of truth to a defamation action." *Id.* In order to show "substantial truth," a defendant need only show that the "gist" or "sting" of the allegedly defamatory material is true. *Id.* "The substantial truth of a statement is normally a jury question, but where no reasonable jury could find that substantial truth has not been established, the question is one of law." *Id.* at 767.

Defendants argue that Sargent and Mansfield's statements to Sheppard regarding Sargent receiving complaints from all of Plaintiff's subordinates save one was substantially true and therefore not actionable. (Doc. 71 at 37). While

Defendants admit that "it was a bit of hyperbole" to state that "all of" Plaintiff's subordinates complained but one, they claim that because five of Plaintiff's subordinates had complained about him, the "gist" or "sting" of the statements were true. (Doc. 71 at 37). The Court agrees. While the statement may not have been "technically accurate in every detail," *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 296 (Ill. App. Ct. 2001), the "gist" of the statement – that many of Plaintiff's subordinates had complaints about his abusive behavior, is undisputed. Accordingly, the Court also finds this statement to be non-actionable.

### E. Qualified Privilege

While the Court has determined that many of Sargent's statements are non-actionable upon other grounds, various allegedly defamatory statements remain. These include: 1) Sargent's statements to Mansfield in September 2007 concerning the complaints against Plaintiff (Doc. 71 ¶ 68); 2) Mansfield's discussion of the complaints against Plaintiff with Sheppard (Doc. 71 ¶ 71); and 3) Sargent and Mansfield's statements to Sheppard at the October 2, 2007 meeting that the allegations made against Plaintiff by Hathaway, Traughber, the Wells, and Salves were true and that Plaintiff had established a pattern of being abusive to his employees (Doc. 71 ¶¶ 73-76). Accordingly, the Court must now determine whether these statements are protected by a qualified privilege.

A defamatory statement is not actionable if it is privileged, which is a question of law. *Solaia Tech., LLC v. Specialty Publishing Co.*, 852 N.E.2d 825, 842 (Ill. 2006). A qualified privilege exists where a statement that might otherwise be actionable is not due to the circumstances under which it was made. *Popko v.*

*Continental Casualty Co.*, 823 N.E.2d 184, 190 (Ill. Ct. App. 2005). Such circumstances "include situations that involve some interest of the party publishing the statement." *Id.* When a corporate employer is investigating the conduct of its employees, it has "an unquestionable interest" in learning of and correcting "a situation where one of its employees may be engaged in suspicious conduct within the company." *Id.* Accordingly, any communications made concerning such investigations are entitled to the qualified privilege. *Id.*

Plaintiff does not object that, facially, Defendants statements are entitled to the qualified privilege. However, Plaintiff maintains that Defendants abused that privilege, and therefore their statements are actionable. (Doc. 82 at 17-19). Plaintiff argues that Defendants abused their privilege by: 1) failing to properly investigate the truth of the allegations, 2) failing to limit the material to the proper parties, and 3) acting in reckless disregard of Plaintiff's rights. (Doc. 82 at 17).

Once a defendant has established a qualified privilege, the plaintiff must come forward with actual evidence creating an issue of fact as to whether the defendant abused that privilege. *Vickers v. Abbot Laboratories*, 719 N.E.2d 1101, 1110 (Ill. App. Ct. 1999). To do so, the plaintiff must provide evidence that defendants either intentionally published the material in question when they knew it to be false, or displayed a "reckless disregard" as to its accuracy. *Id.* at 1108. In order to establish "reckless disregard," the plaintiff may present evidence of "a reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the

material, or send the material only to the proper parties." *Kuwik v. Starmark Star Marketing & Admin., Inc.*, 619 N.E.2d 129, 136 (Ill. 1993).

Accordingly, Plaintiff's argument that Defendants abused their privilege can only succeed if he has presented evidence that Sargent and Mansfield made the defamatory statements knowing them to be false, that they failed to properly investigate their truth, or that they failed to publish the material only to the proper parties.[12]  With regards to evidence that Sargent and Mansfield made statements about Plaintiff knowing them to be false, Plaintiff points to evidence that Sargent was told by Parrish, Plaintiff's direct supervisor, that he was with Plaintiff on the date that the Wells' complaints arose, and that he did not hear any of the alleged abuse take place.  (Doc. 82 ¶ 22).  In addition, Plaintiff points to a letter written by Sargent to the Wells' at the termination of his investigation into their complaint, in which he stated that "My investigation revealed that there was no available corroborating evidence to prove or disprove any allegations made by Larry and Brenda Wells, or in the rebuttal statements provided by [Plaintiff].  Statements relied upon in this complaint were either taken out of context, or not corroborated, so as to make one believe that it was more likely than not that the statements were not made or were unproven."  (Doc. 71-16 at 4).  However, according to Plaintiff, Sargent nonetheless presented the Wells' complaints as being true when reporting to Mansfield and Sheppard.  (Doc. 82 at 17).

---

[12] Because all allegedly defamatory statements other than those made by 1) Sargent to Mansfield and 2) Sargent and Mansfield to Sheppard, have been rendered non-actionable as a matter of law, the argument that the publications were not made to the proper parties is without merit.  In each case, the Defendant reported Plaintiff's alleged conduct to his/her supervisor.

Plaintiff has not succeeded in creating a material issue of fact as to whether Sargent made the statement knowing it to be false.  Plaintiff does not dispute the fact that when Sargent wrote his letter to the Wells, he did not intend it to mean that their complaints were not true, only that they had not been proven.  (Doc. 71 ¶¶ 54-55).  Moreover, while Parrish told Sargent that he did not believe the Wells' complaints to be true, Sargent was free to believe or disbelieve him, and there is no evidence in the record that Sargent found his report to be convincing.   Finally, Sargent states that his belief that the complaints were actually true was buttressed by the subsequent Salves' complaint, which was very similar in nature to those made by the Wells.  (Doc. 71-3).  Accordingly, while Plaintiff has presented evidence that the complaints were false, he has failed to create a genuine issue of fact as to whether Sargent himself believed them to be false when he reported to Sheppard, and thus has failed to present a triable issue as to whether Sargent abused his qualified privilege when he stated that the complaints made against Plaintiff were true. [13]

Nor does the Court find that Sargent and Mansfield failed to properly investigate the complaints made against Plaintiff.  Sargent engaged in investigations of each complaint, either visiting the site or speaking with involved individuals over the phone.  Sargent also received Plaintiff's response as to the Wells complaint and Traughber complaint, and had received corroboration of Salves' complaints from at least one other employee.  Further, it was Sargent's job,

---

[13] For the same reasons, the Court does not find that Sargent knew his statement that Plaintiff had established a pattern of being abusive to his employees to be false.

not Mansfield's, to investigate employee complaints, and therefore Mansfield had no obligation to re-do investigations which Sargent had already completed prior to passing along his concerns. The Court will not engage in a 20/20 hindsight analysis of these investigations, as there is no indication that Sargent did not investigate each complaint thoroughly. *See Larson v. Decatur Memorial Hospital*, 602 N.E.2d 864, 869 (Ill. Ct. App. 1992). Accordingly, the Court cannot find that Defendants violated their qualified privilege, and Defendants' Motion for Summary Judgment as to Plaintiff's claims for defamation must be GRANTED.

## FAMILY AND MEDICAL LEAVE ACT

### I.  Factual Background[14]

On January 21, 2009, Plaintiff requested FMLA paperwork. (Doc. 71 ¶ 91). Two weeks later, on February 4, 2009, Plaintiff sent an e-mail to his subordinates, supervisors, and other colleagues announcing that he would be starting FMLA leave beginning on February 25. (Doc. 71 ¶ 95). On February 24, 2009, Plaintiff returned the paperwork in support of his FMLA leave. (Doc. 71 ¶ 98). The FMLA forms, completed by his physician, stated that Plaintiff was suffering from "severe peripheral neuropathy, bilateral leg lymphedema, [and] morbid obesidty with deconditioning," that his need for leave was due to him being "restricted from repetitive or prolonged standing or walking," and that the conditions were all either "lifelong" or "chronic." (Doc. 71 ¶¶ 99-101).

---

[14] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

On April 23, 2009, Plaintiff sent an email to his new supervisor, Tim McManus, stating that he would return to work the following day. (Doc. 71 ¶ 110). While McManus responded to Plaintiff the following day asking him not to resume duties until they had spoken, he directed an HR representative to resume Plaintiff's pay as of that day. (Doc. 71 ¶¶ 114-115). On May 5, 2009, after various meetings and e-mail exchanges concerning tensions between McManus and Plaintiff, Plaintiff resumed his duties. (Doc. 71 ¶ 135).

In June 2009, Garda was acquired by Defendant Andrews. (Doc. 71 ¶ 150). Leading up to the acquisition, Andrews carefully considered how its operations would merge with Garda's and what redundancies the merger might create. (Doc. 7 ¶ 151). To eliminate any such redundancies, Andrews planned to perform multiple waves of RIFs,[15] starting with one on the day of the acquisition. (Doc. 7 ¶ 152). A rule of thumb for the RIFs was that anytime a Garda employee's position was redundant of an Andrews' employee's position, the Garda employee would be terminated. (Doc. 7 ¶ 153). Randy Andrews, CEO of Defendant Andrews, and Ty Richmond, the Chief Operating Officer of Defendant Andrews, made the determinations as to which employees would be terminated in the RIFs. (Doc. 71 ¶ 156).

Randy Andrews and Richmond determined that Plaintiff's position was redundant with that of Anton Bommersbach, their "Vice President of the Midwest Region," and that therefore Plaintiff would be terminated. (Doc. 71 ¶¶ 154-155).[16]

---

[15] RIF is a commonly-used abbreviation for "reduction in force."
[16] Plaintiff disputes whether his job was actually redundant with Bommersbach's, as well as whether Andrews and Richmond were the ones who made the decision to

At the time they made the decision to terminate Plaintiff, neither Randy Andrews or Richmond had knowledge that Plaintiff had taken FMLA leave. (Doc. 71 ¶ 159).[17] On June 2, 2009, Andrews closed the deal to acquire Garda and executed the first RIF, which included Plaintiff's termination. (Doc. 71 ¶ 160).

## II.    Discussion

In Count IV of his Third Amended Complaint, Plaintiff alleges that Defendant Andrews, as successor in interest to Defendant Garda, violated his FMLA rights following his invocation of FMLA leave by: 1) refusing to restore him to his original or equivalent job upon his ability to return to work; 2) demanding he provide it with a return to work note; 3) terminating his wife's health insurance coverage while he was on leave; 4) terminating his employment; and 5) refusing to consider him for rehire or reinstatement. (Doc. 42 at 6-10). Defendants have moved for summary judgment as to all of Plaintiff's claims. (Doc. 71 at 45-46). Again, Plaintiff has failed to respond to all of Defendants' arguments save his claim that he was terminated in violation of the FMLA, which the Court believes constitute a waiver of his claims. *See Wojtas v. Capital Garden Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007).[18]

---

terminate him. The latter contention will be discussed below. With regards to whether Plaintiff's position was redundant with Bommersbach's, Plaintiff himself has admitted that Bommersbach is now doing what he used to do. (Doc. 86-2 at 15).
[17] Again, while Plaintiff facially disputes this statement, as will be discussed below he provides no evidentiary basis for such dispute.
[18] Out of an abundance of caution the Court has still considered the merits of Plaintiff's claims and notes that 1) Plaintiff's "restoration to original job" claim fails as the undisputed facts show that Plaintiff was returned to substantially the same position when he returned from his FMLA leave (Doc. 171 ¶ 136); 2) Plaintiff's "return-to-work note" claim fails because he has not identified any Garda employees who took FMLA leave but were not required to produce such note (Doc. 71 at 46); 3)

With respect to his wrongful termination claim, Plaintiff attempts to argue an "indirect" case of retaliation under the FMLA. (Doc. 82 at 19). Accordingly, the Court must apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to Plaintiff's claim that Andrews discriminated against him for exercising his FMLA rights. *See King v. Preferred Tech. Group*, 166 F.3d 887, 892 (7th Cir. 1999). Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of prohibited discrimination. *Id.* To establish a *prima facie* case of retaliatory discharge, Plaintiff must establish that: 1) Plaintiff engaged in protected activity; 2) Andrews took adverse employment action against Plaintiff; and 3) there is a causal connection between Plaintiff's protected activity and Andrews' adverse employment action. *Id.*[19] In order to establish a "causal connection," Plaintiff must demonstrate that Andrews would not have terminated his employment but for his invocation of FMLA leave. *Id.* If Plaintiff succeeds in establishing a *prima facie* case of retaliatory discharge, the burden shifts to Andrews to articulate a legitimate, non-discriminatory reason for his termination. *Id.* Finally, Plaintiff then has the opportunity to demonstrate that Andrews' proferred reasons are merely a pretext for discrimination. *Id.*

---

Plaintiff's claim premised upon the mistaken termination of his wife's health insurance benefits fails because the undisputed facts show that the mistake was corrected as soon as it was brought to Garda's attention (Doc. 71 ¶ 105); and 4) there is no evidence that anyone who made the decision not to re-hire him for applied for positions knew of his FMLA leave or refused to hire him because of it (Doc. 71 ¶¶ 163-164).

[19] It is undisputed here that Plaintiff engaged in a protected activity when he took his FMLA leave and that he suffered an "adverse employment action" when he was terminated.

Based upon the undisputed material facts in this case, the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliation, as the evidence shows that the ultimate decisionmakers, Randy Andrews and Richmond, did not even know that Plaintiff had taken FMLA leave. *See Long v. Teacher's Retirement System of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009) ("to demonstrate a causal connection between a protected activity and an adverse employment action, a plaintiff must provide direct or circumstantial evidence that the *decision maker* has acted for a prohibited reason." (emphasis added)). Defendant has provided the affidavit of Ty Richmond, the Chief Operating Officer of Andrews, which states that he and Randy Andrews, CEO of Andrews International, made the decision to terminate Plaintiff as part of a Reduction in Force when their company merged with Garda. (Doc. 71-34 at 2-3). Richmond further states that no one from Garda had any input into the decision to terminate Plaintiff, and that they only learned of Plaintiff's FMLA leave after their decision had already been made. (Doc. 71-34 at 3).

While Plaintiff attempts to dispute these statements, he has put forward no evidence which creates a genuine dispute of fact with respect thereto. Plaintiff disputes Richmond's statements by claiming that "there is evidence that Andrews received input from Garda employees who had knowledge of [Plaintiff]'s leave and medical condition," and pointing to Moore, McManus, and Sargent as having input into the decision to terminate him. (Doc. 82 at 6-7). However, the evidence Plaintiff

points to in order to support this contention fails in any way to do so.[20]  Accordingly, Plaintiff has not created any dispute of material fact as to whether Richmond and Randy Andrews were the ultimate decisionmakers, and that neither one was aware of Plaintiff's FMLA leave at the time they determined that Plaintiff should be terminated.[21]  Therefore, Plaintiff has failed to make a *prima facie* case for retaliatory discharge under the FMLA, and Defendants' Motion for Summary Judgment as to Count IV of Plaintiff's Third Amended Complaint is GRANTED.

---

[20] Local Rule 7.1(D)(2)(b)(2) provides that in responding to a motion for summary judgment, every fact that is claimed disputed must "be supported by evidentiary documentation referenced by specific page." Plaintiff points to page 88 of the McManus Deposition, pages 153-155 of the Sargent Deposition, and page 43 of the Bommersbach Deposition in an attempt to support his claim that Randy Andrews and Ty Richmond were influenced by Garda employees when they decided to terminate Plaintiff.  (Doc. 82 at 6-7).  However, the McManus Deposition only indicates that McManus spoke with Bommersbach concerning Plaintiff prior to his termination, and that even this conversation did not reference Plaintiff's FMLA leave.  (Doc. 83-1 at 23).  Further, the cited portion of the Bommersbach deposition has nothing to do with any conversations between the decisionmakers and Garda employees, and Bommersbach elsewhere testified that he himself played no role in the decision to terminate Plaintiff, only that he was told by Richmond that Plaintiff would not be retained.  (Doc. 83-3 at 8).  Finally, in the cited portion of Sargent's Deposition, Sargent only states that he had been informed that Plaintiff was going to be terminated prior to it taking place, but nowhere states that he had any part in making this decision.  (Doc. 84-1 at 40).

[21] Nor does Plaintiff's reliance upon the circumstantial evidence of suspicious timing overcome his failure to provide evidence that the decisionmakers' determination to terminate his employment was based in any way upon his taking FMLA leave.  *See Simpson v. Office of the Chief Judge of the Circuit Ct.*, 559 F.3d 706, 713 (7th Cir. 2009) ("Temporal proximity between an adverse employment action and a plaintiff's exercise of [his] statutory rights will really be sufficient in and of itself to create a triable issue.").  Further, the Court does not even find the timing to be suspicious as the termination took place on the date the two companies merged, after Plaintiff had already returned from his FMLA leave.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 71) is GRANTED. The Clerk is directed to ENTER JUDGMENT in favor of Defendants and against Plaintiff. IT IS SO ORDERED.

Entered this <u>11th</u> day of August, 2011.

<u>       s/ Joe B. McDade       </u>
JOE BILLY McDADE
United States Senior District Judge
